May it please the Court, I am Timothy Shea. I am here with my colleague Thomas Corcoran on behalf of Wyn Tien Li-Shou. She is the widow of Master Wu, the owner and operator of the fishing vessel JCT-68. This Master Wu was killed by the United States Navy and his ship was thereafter sunk by the United States Navy. And on behalf of Miss Wu, we are seeking compensation for the life of Master Wu and for the deliberate destruction of his District Court erred by ignoring the terms of the complaint and relying improperly on the government's characterization of what went on in finding that there was a belligerency and further in misperceiving and misapplying the tests under Baker v. Carr for non-just disability. The proof of that error, and there's a really very straightforward one before this Court, and that is the government, although it adopts the result of the District Court, it has disavowed the rationale. That is, the government disavows the presence of a belligerency, which was the centerpiece of the District Court's decision. Is belligerency necessary? I mean, we can argue whether there's belligerency here when you have pirates in the high seas having a problem of attacking ships. And we have traditionally sent military personnel, the Marines, remember at Tripoli, to fight the pirates. But our own Tiffany case involved a fighter plane going up against a private plane and the wingtip hit him. And we said that was really part of the executive activity that was shielded from judicial review. Your Honor, Tiffany, of course, was an intrusion, was unauthorized and unnoticed, that is, improperly. There was no notice of an intrusion into U.S. territory. So you think that was belligerent, a private plane that didn't identify itself? And compare that to a pirate ship who's clearly designed and fires bullets and designed to take over ships and extort money. The piracy under the authorities that, on the affirmative side, the authorities that the government has cited for this proposition reflect that this anti-piracy activity was a police action. The presidential finding describes it as a police action. We sent our military there. We didn't send policemen there. We didn't send the FBI. We sent the military. And the fact that we sent the military doesn't make it a belligerency. And we not only sent the military, but we sent the military in cooperation with our military and NATO and let NATO command it, which is through its military operations. And this whole action actually was under the command of a NATO commander, wasn't it? No. Well, the answer is, as far as we're concerned, the answer is no, in the sense that we allege in our complaint that the United States maintained operational control of the U.S. Navy vessel throughout this action. Let's get into that. But I want to get back to this notion of belligerency. As I understand, the Boyle case, that was dealing with the design of aircrafts. But there was no, I don't know if belligerency in any sense was part of it. I've never understood the discretionary function and political question doctrine to be tied to some narrow notion of belligerency. The cases just don't say that. Well, Your Honor, really those bring in different questions. First of all, those FTCA cases, this action is brought under the Public Vessels Act. And of course, this court has never ruled on the question of whether, and if so, how much of a discretionary function exception there is. The courts of the field have unanimously concluded that the Public Vessels Act is subject to a discretionary function exception. I'm sorry, I didn't hear the first. I said the courts have concluded, as far as I know, the case law of which I'm familiar, is that they concluded that the Public Vessels Act is subject to a discretionary function exception. This court decided that the Suits and Admiralty Act is, but McMillan... If we tried to tie this case to some notion of belligerency, and we try to tie it to the Public Vessels Act and essentially read out a discretionary function exception out of the Public Vessels Act, we'd be going against an awful lot of case law. I mean, there's a lot of things that are going against the Public Vessels Act, and the trouble I have is this is a military operation. They're pirates that are disrupting international waters. It's not a domestic thing. It's an international thing. And they're disrupting commercial lines of shipping. And obviously, the United States and NATO have decided that this is something that demands a mandated military response. And what it seems to me, with all respect, sir, you're trying to get us to do is to just draw us into the heart of command decisions involving the United States and its allies, and also get us into the heart of military decisions, which preceded the order of this Dutch commander of the USS Groves in terms of how he carried out the military action. We're going to be second guessing. This doesn't involve a private contractor. This doesn't involve a training exercise. This is an actual military operation. You can try to put a different label on it. I would suggest, Your Honor, that the President of the United States put a law enforcement label on it when he ordained the NATO cooperation. And I suggest that the government is bound by that, number one. Number two, Navy doctrine- Why is that not a political question? I mean, it seems to me- It fell within the executive branch's authority, and he used the authority over the Navy to authorize this, and the authority of the executive to enter into treaties with the NATO and combine their military efforts. You're not addressing, really, the political question, which is the division of powers in the Constitution. First of all, Your Honor, the Public Vessel Suits and Admiralty Act was a general law that dealt with merchant vessels. The Suits and Admiralty Act is directed expressly at the operation of Navy vessels. That's the whole point. The government's argument- The USS Groves is a Navy frigate. Correct. So the point of that is, the government's argument here- It's not a Coast Guard vessel. It's a Navy frigate. And this court, and the United States Supreme Court, has applied the Public Vessel Act for something like 80 years or more to decisions of Naval commanders without any hint of the kinds of limitations that the government- The government is saying, as long as the Navy's involved, this court can't look behind it. That is totally contrary to express purposes- One, just the Navy was NATO, and I mean, I don't know how we get into these things. First of all, the- We've gone right in the statutes, and now we're running the military. No, Your Honor, I knew we'd get there, and I want to thank you for that. Again, I'd like to suggest that the government- I'd like to help you. I'm not asking you to run the Navy- You are asking us to run the military. You are asking us to say, all right, what type of ordinance was used in shelling the ship? Was it the right thing? What about the range selected for the engagement? Should they have waited longer to open fire? How many warnings should have been given the JCT? What parts of the ship should have been fired? Should the United States have entrusted the command of the Groves to a Dutch commander? Should this have been a joint NATO operation? Your Honor, let's start with- It is disrupting commercial lines of traffic. It is the mothership. There are skiffs on board the private ship. The skiffs are going out, and they are sinking and capturing and wreaking havoc on commercial traffic in international waters. And we're supposed to sort of sit up here and plan the operation? No, by no means, Your Honor. Let's take, if I may, the straightforward proposition. On day two, there was no- the JCT 68 was unmanned. There was nobody on that vessel. You're talking about the sinking of the vessel? The sinking of the vessel. With Master Wu on board. What's that? Master Wu's body. Actually, the Navy ship- Does that sound like a separate claim? Is that what you're- We're claiming for both. One claim for the first day, for the firing on the ship, and then one claim for the second day. That's- we're seeking compensation for that, too. Is that what you got? And the answer is yes. On that day, we contend- You think you've got a better case on the second day? We think we have- we probably do have a better case on the second day, but I can say that we're unapologetic about our case for the first day, too, Your Honor. I understand. I understand. I don't expect you to give up anything. But the second day- But there, there was no threat. Second day, the commander, the skipper of the Groves, was acting on the direct orders of the NATO commander. Well, first of all- Did exactly what he was ordered to do. Isn't that right? Well- Under this- First of all, we don't- we don't necessarily- I don't know what those orders mean, and there's no precedent from this court or anywhere- We told him to sink the ship. Well, wait a minute. If I may say, Your Honor, that there's no precedent for the proposition that NATO, which is nothing more than a partnership with the United States, nothing more than a partnership with the United States- absolves- Might be one of the most important partnerships we've ever had. But the fact that a NATO, whatever suggestion or order, however it's characterized, absolves the Navy vessel from legal responsibility. They're the executive branch of government. Your Honor, nothing authorizes them to do things that are contrary to U.S. or international law. And I think that the opportunity for this court- That the commander on the Navy operations is the guy that makes the decisions with respect to the Navy operations. Well, what this court can do with respect to the destruction of the vessel is to say, that vessel belonged to Master Wu and his family. And there is a legal regime out there that says he can't- Courts are supposed to be involved in the disposition of those assets. And the fact that the Navy sank it was an action that we contend- Anytime in the future that we fire upon a private ship that has been overtaken and captured by pirates in international waters, that's going to be subject to a tort action if the ship is sunk. I mean, you're just taking tort law and putting it into the middle of an international waterway and creating a big deterrent in terms of any future engagement with pirates who have captured a privately owned vessel. Your Honor- And that's not the way these things are resolved. Your Honor, let me suggest we've cited, and the government has never addressed the question of BNF trawlers. There, a Coast Guard vessel captured a vessel that had been pirated in the Caribbean when they took the apparent pirates off. The vessel sank while it was under the custody of the Coast Guard. And the Fifth Circuit said that case, the claim for destruction of vessels should proceed. Let me ask you this. We have a 2008 policy of the United States. That's here in the appendix. And it says in this policy statement, we will seize and destroy any implements of piracy and in appropriate cases, seize and destroy vessels outfitted for piracy. Now, the question could be, was this vessel outfitted for piracy? Well, Your Honor, my client, it had been pirated, Your Honor. It had been pirated? It was de-pirated by the time the- It was the mothership and it had skiffs on deck. It had all the armaments. It had all the- But Your Honor, but Your Honor, that vessel remained, obviously, there's no contention here that my client somehow cooperated, but my client was a victim of that. He may have been, but after it was taken, it was turned into the mothership. It was turned into a mothership. But by the time the Navy took its action, there were no pirates on it because it was not pirated anyway. You're arguing with the decision of the NATO commander on the second deck. And I mean, I agree with the decision of the United States vessel as well to follow that illegal action without consulting with registry authorities. Well, how do you see this policy that says we should destroy vessels outfitted for piracy? That is a policy of the United States. Now, it's not NATO, but you said it's illegal under American law. Yes, and I'd like the opportunity to make that presentation. You actually want us to declare this policy, declared policy of the National Security Agency, to be illegal. Actually, no. I would like to suggest that that policy explicitly say it's subject to U.S. law. And I'd like the opportunity to show to this court that that vessel remained Mr. Wu's property after,  to either protect it and preserve it and give my client an opportunity to salvage it if they could. Thank you, Mr. Shea. You have some time for a reserve for rebuttal. Thank you. Mr. Leder. May it please the court, Your Honors. I'd like to first introduce with me at council table is Captain Ann Fisher. She is the United States Navy Admiralty Counsel and Lieutenant Commander Thomas Brown. Mr. Brown was the trial counsel for the United States during this case. I'm going to try to be fairly brief here. My friend argues that he just wants a determination of whether the command by the NATO Commodore, Commodore Hilgens, was consistent with U.S. law. What I urge you to do, and it seems from your questions that Your Honors are very familiar with the arguments, is to think for a moment what either the discovery or the trial would be like that my friend, Mr. Shea, is proposing. Apparently, what we would have is, I guess, we would call to the witness stand Commodore Hilgens from the Dutch Navy, and he would be questioned as to why he ordered that the pirate ship be sunk. He would be asked what considerations did he take into account? Did he take into account U.S. law? What NATO policies was he operating under? What NATO commands did he get? And then I suppose what Mr. Shea would want next is the commander of the Groves, the captain of the Groves, would be put on the stand and would be asked, why didn't you disobey the command of the NATO Commodore, the commander of the task force in which you were serving? And I think that just gives you a flavor of how obviously this would get immediately into political questions. It would be a question of how a U.S. Navy ship should be operating as part of a NATO task force, and should we be disobeying commands of a NATO Commodore? So it seems to us that this clearly immediately falls into political question. As your honors have noted from your questioning, the Tiffany case here seems very much on point. No belligerency there. I'd also refer you to case we cited in our brief, the Actepe case out of the 11th Circuit. Not only was there no belligerency there, it was a tragic case. And by the way, obviously, it's a tragedy here, and we regret Master Wu's death. But the Actepe case- Somewhat diplomatically, as I understand it, I mean, it is sad. And but as I understand it, there are mechanisms for private compensation, mechanisms for diplomatic discussions between the Taiwanese government and the United States. And as I understand it, there are mechanisms for the United States to privately reimburse Mr. Wu's widow. And that's all in good. But the question is, are we going to start handling this outside of diplomatic channels and through the medium of a tortsuit? And having commanders and those in military operations having to look at a military decision and weigh the military consequences on the one hand against the impositions the courts may find in a tortsuit on the other. And the havoc it plays with our chain of command and the havoc it plays with our relationships with our allies and with general decisions that are needed to promote the safety of vessels off the Somali waters and off of the African coast so that they can deliver goods and make the contributions that commerce makes, unimpeded commerce, makes to the general welfare of people living in the respective countries. I mean, the consequences of this are unbelievable. Your Honor, I obviously totally agree with you. I could not have put it more articulately. You're exactly right. That's the thrust of our argument. If we subjected the NATO command and the NATO treaties and policies to American courts too, it might also even damage the cooperation that we could otherwise enjoy among nations. Absolutely, Your Honor. Again, I could not put this more articulately. The last thing I'll mention is, again, the Aktepe case in the 11th Circuit. There, tragically, part of NATO training exercises, a U.S. warship fired live weapons. It should not have, but it did, struck a Turkish destroyer and killed numerous Turkish sailors. The 11th Circuit said, tragic, but that was for the executive branch to make ex gratia payments. I understand there was an ex gratia payment made in this case to Wu's family. That's exactly right, Your Honor. And I think it's footnote one of our brief, we mentioned that. That's as it should be, because nobody's very happy about what happened here. It's a sad situation, but the consequences of us being, co-partnering with NATO commanders and the commander of the USS Grove and the rest are just beyond anything. This is not one of those cases on the margins. It's not one of those cases that involves relationships between government and private contractors or some sort of training exercise or whatever. It is an armed engagement. Right, that's exactly right, Your Honor. The only other thing I'd point out is that my friend, Mr. Shea, has tried to make some arguments that Judge Motz found facts that were inappropriate. The key fact here on the point about the second day is the sinking of the ship. As Mr. Shea's own brief, opening brief at page eight, describes it as a NATO command. So he agrees with us. No, the report in the record, which is uncontradicted, gives the detail minute by minute. Yes, I'm happy to answer questions. You primarily, the government says this whole thing should be disposed of under the political question doctrine? Yes, Your Honor, no. How does the discretionary function exception come into play, if at all? Judge Motz, in a footnote of his opinion, gave that as an alternative holding. And you all argued it when you all had that oral argument. That's in the transcript. It's talked about, but you raise it in your brief, but you do it secondarily. Right. Does it apply more to the second day, the sinking, or does it apply to the whole thing? No, it applies to the whole thing, Your Honor. But you're saying that's just an alternative ground. That's exactly right, Your Honor. Now, I will note, particularly Judge Wilkinson, but I think also, Judge Niemeyer, I'm not positive. Some of the things you've written in prior opinions, you've indicated there's substantial overlap between the discretionary function statute. The discretionary function section is constitutionally derived. Yes, Your Honor. So there is considerable overlap, Judge King, as members of this panel have written. In fact, I think, actually, you also have written that, now that I'm thinking about it. So there's considerable overlap, but the political question doctrine, we think, is absolutely applicable here. Discretionary function, and as Mr. Shea mentioned, in this court, in Bank v. McMellon, the discretionary function is part of the Suits and Admiralty Act. The Ninth Circuit decision that we've cited, Tobar points out that the First, Fifth, Eleventh, and Ninth Circuits have all said that it applies also under the Public Vessels Act. So the McMillan case would take care of it for you, too, you say. Well, I don't want to mislead the Court. I don't want to say that this Court held in McMillan that the discretionary function... Why would there be a different outcome with respect to the Suits and Admiralty Act and Public Vessels Act when, I think, the very unanimous weight of circuit law is that the Public Vessels Act is subject to the discretionary function? Yes. And all I was going to say was the reasoning of McMillan makes clear that it would apply. With the constitutional reasoning. That's what I was getting at. I thought you were just going to say yes. I'm trying. I didn't articulate it well enough, I guess. Yes. The reasoning of McMillan would apply equally to the Public Vessels Act, again, as the First... That's an impact decision. Yes, it is, Your Honor. Yes, it is. Again, I'm... You know, in this case, I know that in reading the internal Navy report on which Judge Motz relied in granting the 12v1 motion, it says the USS Groves executed a graduated use of force against the pirates, issuing warnings, firing warning shots, finally firing at the JCT to from the pirate ship. You know, then they talk about the launchers and heavier machine guns that were on the JCT and everything. And that's precisely what we shouldn't be getting into. Whether they fired sufficient warning shots, or what weapons were on the pirate ship, or whether they aimed at the right part of it. And those are the things that discovery would get into. Whether they should have gotten up closer, and what did they have reason to believe was on the pirate ship, and should they have given warnings, and how many warnings. And the whole thing easily becomes a mess. Again, I agree completely, Your Honor. So, Judge Motz saw this case perfectly, appropriately, and in light of everything you've just said, and issued the correct... Three pirates did the capture. At that time, I think it was about five, because seven, maybe, I'm not... Sixteen. Okay, I'm sorry. One at 16, and two were killed. Two, I believe two were slain, yes. And then there was a hostage. Then there was a small number of hostages, because some of the hostages, the crew of the pirate ship, the fishing vessel, had earlier been released in a completely separate incident. Were they brought back to the United States? Like you used to bring them into Norfolk, or you didn't? The pirates? Yes. This is not in the record. My understanding is NATO took control of the pirates. And so that was a NATO determination. There's no indication that they were brought into the United States. I don't want to take up your time. Thank you very much. I appreciate it. Mr. Shea, you reserve some time for rebuttal. Yes, Your Honor, for me. I think my understanding with respect to the pirates is they were, the suspected pirates were released, and no arrangements were made for any judicial process with respect to them. Let me say with respect to the central discussion we've had here that, first of all, the Public Vessel Act specifically contemplated that decisions of naval commanders would be reviewed. And because of that, there are specific provisions in the Public Vessel Act for special judicial control of review of naval commanders. And so it specifically incorporated judicial review of decisions of naval commanders. And in 80 years of its administration, that has been a common phenomenon. And it has covered all kinds of actions during World War II. We've been over that because you've indicated earlier in our McMillan decision that the Suits and Admiralty Act has a discretionary function exception. And we've also indicated that the great weight of circuit law has indicated that a constitutionally derived discretionary function exception attaches to the Public Vessels Act. Well, actually, I mean, certainly the holding of that case was the Suits and Admiralty Act. It was Suits and Admiralty Act. It did discuss Public Vessel Act, but there was no... Is there any circuit that has denied? The answer is no, Your Honor. All that have dealt with it have found that. But Baker requires a particularized determination, not only with respect to the issue in general, but the history and the administration, the allocation of the decision under the statute. And that's what we cite the Zivakovsky case. The Supreme Court dealt with a question, a political question with respect to a certain citizenship of foreign policy. But the standard of decision would be here. I presume it would be some sort of reasonableness standard. Thank you, Your Honor. But if it's reasonableness, once again, shows we're going to get into determining... It has to be... The duty has to be to refrain from unreasonable action. And we're going to get in as a court to what's reasonable or not in a military engagement of this sort. And that would be the standard of... That would be the... I don't think so. I think they're well established. The government submission says that in a presidential finding say, it's the policy of the United States to repress piracy, consistent with the United States law and international obligations. And the only proposition we're advancing here, Your Honor, is that we should have an opportunity to show that there were violations of U.S. law in connection with this particular action. It's that simple. And there may well be arguments, Your Honor, under B... Let me play that out one second, that comment. Would that mean our commander of the ship would have to disobey the NATO commander who gave the order to sink it? I don't believe... First of all, there is no... And that's an important point. I don't know that... I think there were more than one decision-making here. There were strategic decisions and then there are operational decisions. That's just my one question. The one question was there was an explicit authorization, direction by the NATO commander to sink the ship with the man on it after they did a service, a short-lived service. And if the commander, the American commander, thought that that violated American law, should he have disobeyed the NATO commander? Yes, the answer is yes. The answer is yes. Or alternatively, they're responsible... The answer is they're responsible in damages for that. Just a minute. Why do you say so quickly responsible? Because before that action, we committed that ship to the control of NATO through an explicit order. Well, Your Honor, first of all, I don't believe... But we didn't withdraw it yet. Well, Your Honor, I don't believe that the United States... And we cited there is guidance from... There's authoritative policy from DOD that says when DOD vessels are involved in law enforcement, they're governed by Coast Guard naval approach procedures, number one. Number two, with respect to this particular decision, I don't think that the Navy ever sees full control of vessels... Of course, Your Honor, they can withdraw it. But in this case, the ship was operating under ceded control. Yes. And obviously, the American Naval Command was monitoring what was going on. Yes. And presumably could have withdrawn that control if they thought something up right was going. Or refused a particular order. Well, I'm not sure about that. You would have to withdraw the commission. I mean, they actually... There's an order they're committing this to the NATO control. And the question is now it's under NATO control and NATO issues a command. And the commander says, hey, I don't know if this violates American law or not. What kind of decision are we now putting on the commander? I think the commander has that obligation generally. I think that's what they have to do. And likewise, Your Honor... He's told to obey the NATO commander. Well, I don't think he's told to... And this is... I think this is what the district court should have done. That's not the way the military operates. I'm sorry, Your Honor. The military... The general operation of the military is you follow order. Well, no, they don't... Your Honor, if they were ordered... There are some nations that summarily execute pirates wherever they may be found. If this commander got an order to... Not such an example like the Nazis in World War II or something. But the general proposition is that the military operates on the chain of command. But... And the person at the top makes, you know... It'd been in the military. Well, Your Honor, I think that's true. But there are limits on all of those. If they were... As in the case of... If they were ordered to summarily execute them, I think... I'd like to think that the naval commander would have had some second thoughts about that. And let me suggest... There might be far-fetched examples like what happened in World War II. There might be some. But there's a general proposition of whether you fire at the ship and try to neutralize it or whether you dispose of the ship once it's taken under their control, that kind of stuff. It's not the example you're getting to. May I respond to one simple proposition here? The Public Vessel Act applied throughout World War II. And it applied even to secret actions in World War II. That is, there was a declared war. The United States was a country at risk. It applied throughout those and to secret actions during that time. The only difference was that they were deferred till after the conclusion of the belligerency. Whatever went on on this day, date, and time that's an issue here doesn't approach that. And I would suggest to this court gently that it would unfairly characterize this confrontation to suggest that this is somehow more important than the secret actions that were subject to judicial review during World War II. I'm happy to answer any other questions for this court if you have anything. We thank you, Mr. Shea. Thank you. We will adjourn court and come down and greet counsel.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, Robert B. King